**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RALPH E. DEERWESTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 13 C 0218 |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security** | ) | **Magistrate Judge Michael T. Mason** |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Ralph E. Deerwester ("Deerwester" or "claimant") brings this motion for summary judgment [15] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Deerwester's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). 42 U.S.C. § 1382c(a)(3)(A). The Commissioner filed a cross-motion for summary judgment [27] asking this Court to uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment [15] is granted in part, the Commissioner's cross-motion for summary judgment [27] is denied, and the case is remanded for further proceedings consistent with this Opinion.

**I.      BACKGROUND**

**A.      Procedural History**

1

Deerwester filed his applications for SSI and DIB on July 25, 2008. (R. 12-29.) In both applications, he alleges that he has been disabled since June 1, 2007 due to mental issues, including depression, and physical impairments, including back pain. (R. 122, 157.) His application was denied initially on March 13, 2009, and again on December 30, 2009, after a timely request for reconsideration. (R. 21.) On January 6, 2010, Deerwester filed a request for a hearing. (*Id.*) On June 21, 2011, Deerwester appeared at his hearing (*via* video), and testified before ALJ Mary Ann Poulose, along with Vocational Expert Susan Entenberg. (*Id.*)

On August 31, 2011, the ALJ issued a decision denying Deerwester's SSI and DIB claims. (R. 21-33.) Deerwester filed a timely request for review with the Appeals Council, and on November 14, 2012, the Appeals Council denied that request. (R. 1-4.) The ALJ's decision then became the final decision of the Commissioner. *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Deerwester subsequently filed this action in the District Court and the parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c) [13]**.**

### B. Medical Evidence

#### 1. COPE Behavioral Services

Deerwester visited COPE Behavioral Services over the course of several years starting in 2003. (R. 294.) At his first visit, on March 15, 2003, Justine Confino, PNP, noted that Deerwester suffers from sadness, insomnia and frustration, and she noted his goal was to decrease depression. (*Id.*) In April of 2004, Deerwester underwent a behavioral health assessment at COPE. (R. 280-93.) The assessment noted that

Deerwester was not taking any medications and he did not experience dizziness, passing out, nausea or vomiting, difficulty sleeping, infections, or unusual sweats or chills.  (R. 201.)  As part of the assessment, Deerwester noted that he had been suffering from depression for about two years.  (R. 283.)  In addition, he had "a lot of anger" and he "[couldn't] handle people."  (*Id.*)  He also stated he had never considered hurting himself or harming someone else.  (R. 285.)  He was described as agitated, depressed, talkative, coherent and optimistic.  (R. 286.)  Deerwester also reported that he had left his job five months ago "because of...substance abuse."  (R. 290.)

On April 22, 2004, a physician with COPE diagnosed Deerwester with bipolar depression.  (R. 279.)  On May 27, 2004, he was examined at COPE and Deerwester reported anxiety attacks and difficulty sleeping.  (R. 278.)  On June 24, 2004, a COPE physician noted that Deerwester recently returned from a family reunion which he found stressful, and he was prescribed some medication to help with his symptoms.  (*Id.*)

### 2.  New Perspectives Center - Counselor Ann Heath

Deerwester regularly met with a counselor, Ann Heath, at the New Perspectives Center for his mental issues starting in May of 2008.  (R. 790.)   In July of 2008, Heath noted that claimant had "an increase in nightmares, agitation and sleep problems."  (R. 465.)  He was also filling out disabiltiy paper work, which he found confusing and frustrating because "he never thought he would be on welfare and is ashamed to be applying."  (*Id.*)  In an assessment dated November 19, 2008, it was noted that his thought process was "linear," "goal directed," "coherent" and "cohesive."  (R. 441.)  His mood was described as "depressed but better," he was "interactive" and "calm," and his

memory was intact.  (R. 441.)  On January 22, 2009, he was described as "back on his meds" and "doing better."  (R. 433.)

On February 26, 2010, Heath noted that claimant "seem[ed] within balanced mood range and relieved from depression and nightmares."  (R. 695.)  At this appointment, he also mentioned that he was putting off picking up medications because of the cost.  (*Id.*)  He stated that he seems to have an increase in symptoms if he stops taking his medication for a few days.  (*Id.*)  On March 26, 2010, Heath noted that Deerwester was feeling better and was learning to walk away from disagreements with his girlfriend, rather than "just explode."  (R. 698.)

On April 12, 2010, Heath noted that Deerwester was "friendly," "outgoing," and "in a good mood."  (R. 701.)  He acknowledged that his  symptoms worsen when he stops taking his medications, and that he continues to have problems with "med compliance" because of "memory problems."  (*Id.*)  He walks over a mile a couple of times a week, and pushes himself to exercise, but suffers afterwards due to "chronic pain."  (*Id.*)  Heath also noted that claimant seems "more balanced in mood and handles stress more effectively."  (*Id.*)  On April 27, 2010, she noted that he "continues to report stable mood," has been able to "take meds more consistently," "has been more stable in functioning" and "believes new med regime [is] helpful with mood swings and nightmares."  (R. 704.)

On May 11, 2010, Heath noted that Deerwester continued to have problems remembering to take his medication but "despite missing these meds, he has continued to do well mood-wise, and although [he] has strange dreams, no nightmares."  (R. 707.)  On May 28, 2010, she opined that Deerwester "continues to present with somewhat

more stable functioning although med compliance is a concern as [he] has memory problems and easily gets off-track due to mood disorder." (R. 710.) In an annual update dated June 21, 2010, Health reiterated that Deerwester has "a chronic problem with memory and inconsistent about taking meds as prescribed" but this seemed to be improving. (R. 716.) She stated his sleep was improving, along with his PTSD, and he has been free from nightmares. (*Id.*) He was also maintaining a household with his girlfriend Tina and parenting a teenager. (*Id.*)

On September 3, 2010, Heath noted that Deerwester had broken off his relationship with his long-time girlfriend, he was "enjoying the peaceful atmosphere in the home," and he was enjoying being able to visit neighbors and come and go without [his girlfriend] becoming jealous." (R. 734.) At this appointment, Heath also noted that claimant's symptoms seemed "stable." (*Id.*) On September 15, 2010, claimant reported that he and his son were keeping up with the chores. (R. 737.) He also told Heath that in the mornings he experienced difficulty walking and keeping his balance, as well as some slurred speech and grogginess, but this wears off by 10:00 am, and "the rest of the day he is doing well." (*Id.*) Heath also suggested that he discuss these symptoms with Carol Reeves, his medication provider, because they could be possible side effects from something he had been prescribed. (*Id.*) On September 28, 2010, he reported that he forgot to mention these issues to Reeves, but that they had gone away. (R. 740.) He also noted he was "feeling good," and his "PTSD symptoms are less intrusive since nightmares decreased with the medications." (*Id.*)

On October 13, 2010, Deerwester noted that he was depressed and lonely. He was walking to the store regularly and walking with a friend but needed to take pain

medication.  (R. 742.)  On November 10, 2010, he noted that he was walking every other day with a friend (not alone due to his anxiety) and he was "feeling calmer, not as agitated and easily upset and rude to people."  (R. 751.)  He also stated that his diabetes was "under fairly stable control."  (*Id.*)  On January 15, 2011, he reported that things were "going well" and his mood was "stable," although he was having difficulty sleeping. (R. 765.)

On May 4, 2011, Heath completed a Medical Source Statement, in which she addressed what Deerwester was capable of doing despite his impairments. (R. 786-91.) Heath stated that his symptoms meet criteria for bipolar II disorder with persistent recurrent depressive episodes.  (R. 790.)  She noted that he has responded well to medications.  (*Id.*)  She also noted that Deerwester has symptoms of PTSD related to a history of abuse as a child.  (*Id.*)  She noted that he has been pushing himself to walk more in the neighborhood to help with both his bipolar disorder and PTSD, and his ability to perform activities of daily living fluctuates with mental status.  (*Id.*)

In this statement, Heath indicated that claimant would need to rest for some period of time during an eight-hour work day, in addition to a morning break, lunch break and an afternoon break scheduled at two hour intervals.  (R. 790.)  She also stated that Deerwester would need more than four hours of rest during an eight-hour day.  (*Id.*)  In her statement, she characterized Deerwester's ability to perform the following work activities as "fair": adherence to neatness and cleanliness standards, making simple work-related decisions and carrying out two-step instructions.  (*Id.*)  She characterized Deerwester's ability to perform the following work activities as "poor": traveling alone to familiar places, understanding and carrying out detailed written and

oral instructions, maintaining attention for two hour segments, sustaining an ordinary routine without special supervision, working in coordination with others and getting along with others without being distracted, responding to criticism and responding appropriately to changes in the work routine. (*Id.*) Finally, Heath characterized Deerwester's abilities as "none" with respect to the following: completing a normal workday/workweek without interruptions from psychologically based symptoms or an unreasonable number of rest periods, using public transportation, traveling to unfamiliar places, and regular attendance. (*Id.*) She noted the side affects of his medications were fatigue, dizziness, dryness and constipation, and she opined that Deerwester is "unable to sustain most mental activities... He has basic abilities but unstable performance and inconsistency in functioning due to mood anxiety disorder symptoms." (R. 788.) She noted no restrictions of daily living, but that he had "marked" difficulties in maintaining social functioning, "extreme" difficulties in maintaining concentration persistence or pace and "extreme" episodes of decompensation within a twelve month period, each of at least two weeks duration. (*Id.*) She diagnosed him with bipolar disorder and PTSD, noting that her diagnoses were based on her ongoing assessment, observation and ongoing treatment. (R. 799.) She stated that based on the bipolar disorder, his functioning would be limited by episodes of depression and sad moods, loss of interest, motivation and energy, pessimism and low self-esteem. (*Id.*) Based on his PTSD, he would have sleep disorders, anxiety and panic issues. (*Id.*) These issues would cause him to miss two to three days or up to a week of work per month. (*Id.*)

In an addendum dated May 4, 2011, Heath noted that Deerwester requires a "supportive environment to achieve and maintain stability." (*Id.*) She also opined that at

times, he "decompensates, and demonstrates insufficient personal resiliency and coping or problem solving skills and depends on environmental supports to recover functioning." (*Id.*) She concluded that "attempting to manage competitive employment would result in rapid decompensation and he would be unable to sustain an appropriate level of functioning over a normal work day or work week on an ongoing basis." (*Id.*) At the end of this addendum, it was noted that Carol Reeves, PNP, "support[] Mr. Deerwester's disability claim" and concurred with this report. *Id.*

### 3. Dr. Patrice Carrello

Dr. Patrice Carrello, Ph.D., conducted a psychiatric evaluation of claimant on February 21, 2009. (R. 537.) At that examination, claimant reported three complaints: (1) he experienced "deep dark moods where he does not want to do anything for days;" (2) he is easily agitated; and (3) he is forgetful. (*Id.*) He also reported that his "moods" dated back to childhood and he was first treated for depression and anxiety at age 16. (*Id.*) He reported that during his current episode of depression, his mood is sad and hopeless, his energy is low, he has little interest in activities or social interactions, he does not want to shower or take care of himself, and his sleep is poor due to nightmares. (R. 538.) He also noted that his appetite is typically low, where he can sometimes go days without eating, and his depression has caused him to lose two marriages and a number of jobs. (*Id.*) On occasion, he has episodes of happiness described as lasting a few minutes to half a day; however these episodes tend not to happen when he is taking his psychiatric medications. (*Id.*)

Claimant also reported that he suffers from agitation, which is defined by a tendency to be easily angered by insignificant life events. (*Id.*) Lastly, he reported

forgetfulness dating back to a head injury in 2002. (*Id.*) This leads him to forget things a family member has asked him to remember or other information he has just learned. (*Id.*) Dr. Carrello noted that claimant was "attentive to the pace of the interview and able to stay focused on the topic at hand." (R. 540.) He reported that he helps his son get ready for school every morning and then goes back to bed. (*Id.*) He enjoys cooking simple meals, and his girlfriend does most of the grocery shopping for him. (*Id.*) Dr. Carrello noted that his immediate memory was fine, but his recent or past memory was not as good. (R. 541.) With respect to his concentration, he stated he was able to repeat serial numbers forwards but not backwards. (*Id.*) He also noted that claimant's current episode of depression coincides with the discontinuation of some medications. (R. 542.)

Dr. Carrello opined that claimant would be able to understand verbal information, attend and respond to instructions, perform simple and repetitive tasks, adapt to new situations, and engage in appropriate interpersonal interactions. (R. 543.) He noted however, that claimant "struggled with some of the tasks, including recall of recently learned information and attention and concentration to complex information." (*Id.*) In addition, "his behaviors and cognition were notably depressed and defeatist." (*Id.*) Dr. Carrello concluded that claimant "would have difficulty performing detailed and complex tasks, interacting with coworkers and the public, performing work activities on a consistent basis without special instruction, completing a normal work week without interruption from his psychiatric condition, and dealing with the usual stress encountered in the competitive work environment." (R. 543.)

### 3. Nurse Practitioner Julie Slind-Hull

Deerwester also saw nurse practitioner Julie Slind-Hull, PNP, several times for medical treatment. On September 23, 2008, Slind-Hull examined Deerwester and noted a "well-groomed male in no acute distress." (R. 502.) She noted a negative straight leg raise, and pain between the shoulder blades with range of motion. (*Id.*) He reported that he had been taking anti-inflammatory medication for increasing problems with pain. (*Id.*)

Slind-Hull ordered several radiology reports on December 1, 2008. For the lumbralsacral spine, it was noted that Deerwester's alignment of the lumbar spine was intact and there were no findings of spondylolsys at any level. (R. 499.) There was moderate degenerative faced disease in the lower lumbar spine from about L4-S1, as well as small degenerative end plate spurs noted anteriorly at multiple levels. (*Id.*) The report concluded that it was an "otherwise unremarkable study." (*Id.*) There were no problems noted with the thoracic spine at this time (R. 500.) A radiology report of the cervical spine noted "mild degenerative disc disease at the C5-6 and C6-7 levels with normal alignment of the cervical spine." (R. 501.)

On April 9, 2009, Slind-Hull examined claimant for a cough. (R. 575.) She noted that he had not been taking his blood pressure medication over the past two months and he has noted increased problems and elevated blood sugars. (*Id.*) She also noted that he continues to smoke. (*Id.*) She diagnosed him with benign essential hypertension, acute bronchitis, nicotine dependence, and type II diabetes mellitus. (R. 576.)

On April 23, 2009, Deerwester went to see Slind-Hull for follow up on his type II diabetes. (R. 572.) She noted that his blood sugars have not improved since switching

medications, and he was experiencing hand numbness, weakness and clumsiness. (*Id.*)  During a physical exam, she noted "normal gait... no joint swelling seen, normal movements of all extremities.., no joint instability.. And muscle strength and tone were normal."  (R. 573.)

On January 8, 2010, Deerwester reported that his blood pressure and his blood sugars were improving.  (R. 647.)  Her report also notes that although he had not taken his medication that morning, he stated that when he does take it, there is significant improvement in his blood pressure.  (*Id.*)  Her examination during this visit revealed that everything was normal and there was no mention of back issues or pain.  (*Id.*)

On November 16, 2010, Slind-Hull examined Deerwester for joint pain in his shoulder and noted limited range of motion.  (R. 687.)  This report notes that he denied "having swelling, clicking, shoulder bruising, instability, redness, warmth, numbness in the arm, weakness in the arm, pain in the arm, ... pain in the neck, [and]... pain in other joints."  (R. 688.)  She also noted "5/5 motor strength in all directions, normal muscle tone, no joint laxity and no joint dislocation.  Painful forward flexion.  Painful extension. Painful external rotation.  Painful adduction."  (*Id.*)

On March 18, 2011, Deerwester visited Slind-Hull again, and she noted that his "blood sugars have been improving," and that he reported no problems with other medications.  He also reported that his shoulder was stable but the recent steroid injection did not help.  He was returning to her office for a Toradol injection for the pain "as that seems to help the best."  (R. 689.)  After a physical musculoskeletal examine, Slind-Hull opined "arthralgias and joint stuffiness, but no joint deformity, no mayaligas, no joint swelling, no limb pain and no back pain."  (R. 690.)  She also noted that

"physical examination of the left shoulder indicates subacromial bursitis, but no joint swelling seen, there was no joint instability noted and muscle strength and tone were normal." (R. 691.)

In a Medical Source Statement dated April 26, 2011, Slind-Hull stated that Deerwester would need to rest during an eight-hour work day (in additional to morning break, lunch period and afternoon break spaced two hours apart) because of pain. (R. 793.) She opined that he would need to be resting in either a lying down or reclined position for two hours out of an eight-hour work day. (*Id.*) She also stated that he would only be able to sit continuously for one hour and for a total of three hours over the course of an eight-hour work day. (R. 794.) She opined that he did have the ability to ambulate effectively, although he could only do so walking or standing continuously for thirty minutes and for a total of two hours over the course of an eight-hour day. (*Id.*) She said he would need to walk every twenty minutes for ten minutes at a time, and claimant would need a job where he could shift positions "at will" from sitting, standing or walking. (*Id.*)

Regarding his physical abilities, Slind-Hull opined that claimant could: occasionally carry one to five pounds, and never anything heavier, occasionally balance, rarely climb, stoop, reach, or handle or grasp items; occasionally pick up things with both hands, but only sustain continuous, repetitive hand use for ten minutes. (R. 795.) With regard to his mental functioning, she opined that his abilities were between fair and poor; notably, she rated as "poor" his ability to maintain regular attendance, maintain attention for extended periods, understand and carry out instructions, work in proximity to others, and work a normal workweek without interruptions from

psychologically based symptoms and perform at consistent pace with an unreasonable number and length of rest periods. (R. 796.) She also stated he had "marked" limitations in: restrictions of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace; and only "moderate" episodes of decompensation. (R. 797.) She concluded that claimant suffered from bipolar disorder and PTSD, which cause mental acuity, and lumbar degenerative joint disease, and chronic shoulder pain, which limit his mobility. (R. 798.) She concluded that these conditions could cause him to need to miss approximately four to ten days per month and that his limitations were permanent. (*Id.*)

### 4. Nurse Practitioner Michael Sholar

Michael Sholar, a nurse practitioner, also saw Deerwester during this time at the New Perspectives Center. On April 19, 2009, Sholar completed a mental residual functional capacity assessment. (R. 562-63.) He opined that Deerwester had marked limitations in the following: ability to understand, remember and carry out simple or detailed instructions, the ability to remember locations, the ability to maintain attention or concentration for extended periods, working with others without being distracted, interacting appropriately with the general public and with supervisors and co-workers, traveling to unfamiliar places, dealing with changes in the work setting and setting realistic goals or making plans independently of others. (*Id.*)

### 5. State Agency Physicians

On February 2, 2009, Dr. Richard Alley performed a Physical Residual Functional Capacity assessment. (R. 527-34.) Dr. Alley opined that Deerwester could frequently lift and carry up to ten pounds, and occasionally up to twenty pounds. (*Id.*) In addition,

he could stand or walk at least two hours in an eight hour work day and he could sit for two hours in an eight hour work day. (*Id.*) Deerwester could perform unlimited pushing and pulling, (including operation of hand and/or foot controls), aside from the limits on lifting and carrying weight. In terms of postural limitations, Deerwester was incapable of climbing ladders, ropes and scaffolds and was limited in his ability to climb ramps or stairs. (*Id.*) There were no limits on his ability to balance, stoop, kneel, crouch, or crawl, no manipulative limits (such as reaching, handling, fine manipulation or feeling), and there were no visual or environmental limitations. (*Id.*)

On March 12, 2009, Dr. Joshua Boyd completed a psychiatric review technique for Deerwester. (R. 544-61.) In that assessment, Dr. Boyd examined the "B criteria" for mental impairments, and opined that Deerwester's restrictions on activities of daily living were "moderate," his difficulties in maintaining social functioning were "moderate," his difficulty in maintaining concentration, persistence or pace was "moderate" and there was insufficient evidence regarding episodes of decompensation. (R. 554.) He also opined there was no evidence of "C criteria."

Dr. Boyd reviewed claimant's medical records and stated that there was "no objective evidence to suggest that [Deerwester] is not capable of at least simple routine tasks," and "[h]e was able to sustain pace/persistence throughout New Perspective visits..." (R. 556.) Dr. Boyd also opined that he would have "difficulty performing detailed and complex tasks, interacting with co-workers and the public,... and he may do best in a more independent work setting." (R. 560.)

## C.  Hearing Testimony

Deerwester testified that he resides with his son who was 16 years old at the time. (R. 45.) He attended high school through 11th grade and then received a GED. (*Id.*) The last time he worked was in 2007, when he was a mail route driver. (*Id.*) In that position, he regularly sat, stood, walked, and carried a mailbag weighing around twenty pounds. (R. 45-46.) He was fired from this position because he did not get along well with his new supervisor after the supervisor tried to make certain changes in the work place. (R. 46.)

Prior to that job, in 2003, Deerwester worked selling and restoring cars. (R. 46-47.) This job also required Deerwester to carry car parts weighing up to twenty pounds. (R. 47.) He left this job because again he did not get along with his supervisor. (*Id.*) Deerwester was also fired from another car sales job that he previously held because of a conflict he had with the owner's son. (R. 48.) Deerwester also worked as a security guard, collecting money from certain stores. (*Id.*) In this position, Deerwester was armed, and this job did not require him to lift anything heavy. (R. 48-49.)

Deerwester testified that he has a driver's license and has no problems driving. (R. 49.) He is also able to take care of all of his personal needs, but does have trouble bending over to put on his socks. (*Id.*) Deerwester enjoys cooking, but he does not do any dishes or laundry (his girlfriend takes care of these things). (*Id.*) Deerwester handles all of the bills in his household, although his girlfriend handles the money. (R. 49-50.) For the most part, he stated that his son is able to take care of himself. (*Id.*)

Deerwester testified that when grocery shopping he is able to lift and carry items such as a case of twenty-four cans of soda or a gallon of milk, but usually does not because his son is with him. (R. 51.) Walking around the store is a struggle for

Deerwester because his lower back hurts after ten to fifteen minutes of walking.  (*Id.*)  Deerwester can also not stay in the store for long periods of time or stand in line for too long because of his anxiety.  (*Id.*)

When Deerwester is cooking, he can stand for about ten or fifteen minutes before his back starts to hurt.  (R. 52.)  Even when sitting down, he has lower back pain.  (*Id.*)  It is necessary for him to sit in a reclined position in order to remain seated for long periods of time without back pain.  (*Id.*)

Deerwester has one neighbor with whom he is friendly and social.  (R. 52).  The two of them go for walks around Deerwester's apartment complex.  (R. 53).  He enjoys reading and watching television.  (R. 52-53.)  He used to enjoy fishing but now it is too difficult for him because it involves standing.  (R. 53.)   Deerwester said that he is able to walk up the stairs in his apartment, alternating feet while holding onto the railings.  (R. 54.)   He avoids bending or squatting over to pick something up.  (R. 55.)  Deerwester can reach high for an object with his right arm, but not with his left.  (*Id.*)  In addition, he is able to hold a fork or a coffee cup but writing for extended periods of time causes electric-like shocks in his hand due to carpel tunnel.  (R. 55-56.)

At the time of the hearing, Deerwester testified that he was taking medication for his physical ailments (blood pressure, cholesterol, diabetes, and back and shoulder pain), as well as his mental ailments (bipolar syndrome, PTSD and anxiety).  (R. 56.)  Among others, he is taking muscle relaxers, pain medicine, medicine for nightmares, and potassium pills.  (*Id.*)  He does not experience any side effects from any of his medications.  (*Id.*)  Symptoms of his bipolar condition include a range of mania where he feels like he could do anything, to dread and doom, where he feels depressed.  (*Id.*)

The medication for his bipolar syndrome seems to be effective, however, the medication for his anxiety is not very effective.  (R. 57-58.)  He does not drink alcohol.  (R. 58.)

Dr. Carol Reeves prescribes his psychiatric medications and he visits her once every two weeks.  (*Id.*)  He also sees his therapist Ann Heath every two weeks for individual therapy.  (R. 59.)  When his anxiety sets in, he starts sweating, his heart starts racing and he feels like he needs to get out of the area.  (*Id.*)  To help with his anxiety, he has been using a new technique called "grounding."  (R. 60.)  It takes Deerwester about five minutes to calm down using this technique.  (*Id.*)  Deerwester said his anxiety can be triggered by hearing something bad on the news or by certain smells.  (R. 60-61.)  His anxiety makes Deerwester feel the need to leave the place where the anxiety is triggered.  (R. 64-65.)  For example, if he is in the grocery store and he starts to feel anxious, he usually walks outside to have a cigarette and tries to focus on something else. (*Id.*)  He testified that this was a problem with his employment because there were instances where his anxiety would set in and he would have to leave whatever he was doing.  (R. 65.)

Deerwester said a typical day starts with coffee that either he or his son makes.  (R. 61.)  Then he will watch TV, put on a movie or turn on the computer and play solitaire.  (*Id.*)  He usually naps at least once a day for a couple of hours because of his depression.  (R. 66.)  His girlfriend Tina is also home during the day so they may go to the grocery store or to Walmart, and he occasionally socializes with neighbors.  (R. 62.)  Tina also accompanies Deerwester to his doctors appointments.  *(Id.)*

Even with his medication and grounding technique, Deerwester testified that he would not be able to perform the job that he previously had now because the long hours

17

of standing and walking would be problematic due to his back pain.  (R. 67.)  He also explained that he would not be able to appropriately deal with customers because he has "some mood fluctuations from being depressed to being anxious and being manic." (*Id.*)  In addition, Deerwester's mania can affect his ability to concentrate.  (R. 68).

## D.  Vocational Expert's Testimony

Vocational Expert Susan Entenberg ("the VE") also testified at the hearing.  (*Id.*) She classified Deerwester's prior work in car sales and in security as light and skilled or semi-skilled.  (R. 69.)  His work as a production worker was classified as medium and semi-skilled.  (R. 70.)  The VE's opinion was that for a person of Deerwester's age, education and experience who was "limited to unskilled work that didn't require interaction with the public, and only occasional [interaction] with coworker[s] and supervisors," it would not be possible to perform the jobs he previously held.  (*Id.*)

However, the VE also opined that routine jobs with low to medium exertional levels and no special instructions could be performed by such a person, as long as he or she is able to lift weight of above 5 pounds.  (R 71-72.)  She also noted there were plenty of jobs in the regional or national economy in this category.  (*Id.*)  In any of these jobs, Deerwester would be off-task no more than ten percent of the actual work time. (R. 71.)  The VE also opined that if an individual could only occasionally lift up to five pounds, none of these jobs could be performed and the individual would be at a sedentary level.  (*Id.*)

## II.  LEGAL ANALYSIS

### A.  Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Keeple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). In determining whether there is substantial evidence, the Court reviews the entire record. *Keeple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to [the] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that [he] considered the important evidence and... to enable us to trace the path of [his] reasoning." *Scott v.*

*Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (*quoting Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)).

### B. Analysis under the Social Security Act

In order to qualify for supplemental security income, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

Here, the ALJ followed this five-step analysis. At step one, she found that claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the time period from alleged onset

date of June 1, 2007 until the present time of the ALJ hearing.  At step two, the ALJ held that Deerwester did suffer from severe mental impairments; specifically, bipolar disorder, post-traumatic stress disorder (PTSD) and alcohol dependence (currently in remission).  She found that these mental impairments more than minimally impact his ability to engage in skilled work and to interact appropriately with others.  However, the ALJ also found that Deerwester's physical impairments (mild cervical degenerative disc disease, lumbar degenerative facet disease, diabetes mellitus, left shoulder bursitis, hypertension, hypercholesterolemia and obesity) were not severe impairments.  Instead, she found that "the effects of these impairments, considered singly and in combination, do not cause more than minimal functional limitations."

At step 3, the ALJ found that Deerwester does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  She examined and considered the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, with specific attention to Listing 12.04 (affective disorders), Listing 12.06 (anxiety-related disorders) and 12.09 (substance addiction disorders).  At step 4, the ALJ found that Deerwester has the residual functional capacity ("RFC") to perform a full range of work at all levels but with the following non-exertional limitations: unskilled work requiring no public interaction and that involves occasional coworker and supervision interaction.  She then determined that Deerwester was not able to perform any past relevant work.  At step 5, she concluded that there are jobs that exist in significant numbers in the national economy the claimant can perform.  As a result, the ALJ found that claimant is not disabled under the  Act.

Deerwester now raises several arguments in support of his position that the ALJ erred in making this determination. First, he argues that the ALJ failed to properly assess the medical evidence in making her residual functional capacity ("RFC") determination. Next, he argues that the ALJ erroneously discredited the opinions of Julie Slind-Hull, Carol Reeves and Ann Heath. He then argues that the ALJ improperly assessed his physical limitations in finding that he has the RFC to perform a full range of work. Finally, he argues that the ALJ improperly evaluated his credibility. We address each of these arguments below.

## III. DISCUSSION

### A. The ALJ Did Not Build a Logical Bridge in Making her RFC Determination

Claimant makes a number of related arguments regarding the ALJ's RFC determination for his mental impairments. First, he argues that at step 3, the ALJ erred in not assessing "Paragraph A" of Listing 12.04, which covers affective disorders. Under Listing 12.04, a claimant must meet the "Paragraph A" criteria and then also meet either the "Paragraph B" or "Paragraph C" criteria of that listing. Here, the ALJ skipped right to the question of whether claimant met the criteria in Paragraphs B and C, without specifically considering whether Paragraph A was satisfied.

We agree with the Commissioner that it is presumed that the ALJ did find that Paragraph A was satisfied, which is why she did not specifically examine Paragraph A and instead moved on to the criteria in Paragraphs B and C. The criteria in Paragraph A substantiate the presence of a medical disorder. Here, the ALJ acknowledged that claimant suffered from a medical disorder, and her finding that claimant was not

disabled was the result of her analysis regarding the Paragraph B and C criteria. Therefore, we find that the ALJ's failure to specifically address Paragraph A does not warrant remand. *See, e.g., Herron v. Comm'r Soc. Sec.,* 788 F. Supp. 2d 809, 816 (N.D. Ind. 2011) ("The ALJ did not discuss whether [claimant] had presented sufficient evidence to meet the Paragraph A criteria, apparently assuming he had.").

Plaintiff also argues that the ALJ ignored certain relevant and favorable medical evidence in making her RFC determination. As we explained above, for purposes of evaluating a claimant's mental impairments and determining an RFC, the ALJ must determine whether the "Paragraph B" criteria are satisfied. This requires that claimant have at least "marked" limitations in two of the following categories: restrictions of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. Applying this test to claimant's mental impairments, the ALJ held that claimant's restrictions of activities of daily living were only "mild," his difficulties in social functioning were only "moderate," his difficulties in maintaining concentration, persistence or pace were "mild," and there were no episodes of decompensation. For these reasons, because there were not two categories with "marked" difficulties, the ALJ determined that claimant was not disabled.

In reaching this conclusion, the ALJ discredited the opinion of Deerwester's mental health counselor, Ann Heath, and his medications prescriber, Carol Reeves (both of whom he consistently saw every two weeks), and part of the opinion of Dr. Carrello. The ALJ did not mention the medical statement of nurse practitioner Michael Sholar. Heath, Reeves, Dr. Carrello and Sholar all opined that Deerwester lacked the

ability to manage a work week or a competitive work environment.  All of them also noted that Deerwester had noteworthy memory problems and inconstant medications compliance, which could signal a problem with following work-related instructions.  The ALJ discredited these opinions and made her RFC assessment relying primarily upon Deerwester's testimony and some treatment notes.  Although the ALJ stated that she was giving weight to Dr. Carrello's opinion that Deerwester's concentration and attention were intact throughout the examination, the ALJ gave no weight to Dr. Carrello's ultimate conclusion that Deerwester would have "difficulty performing work on a consistent basis..., completing a normal work week without interruption .. and dealing with the stress of a competitive environment."

Because she discredited these opinions, the ALJ apparently came to her own conclusions in finding that Deerwester's restrictions in the relevant categories were only mild and moderate.  "An ALJ may reject the medical opinions in the record when none of the doctors provide medically acceptable evidence to support their opinions." *Lavoie v. Colvin*, No. 13 C 2560, 2015 WL 393414, at *7 (N.D. Ill. Jan. 27, 2015).  "But in such a case, the ALJ may not substitute his own medical opinion for that of the opinions in the record when determining the RFC." *Id.* (citing Scivally *v. Sullivan, M.D.,* 966 F.2d 1070, 1077 (7th Cir. 1992)).  "Instead, when an ALJ rejects a medical opinion or opinions, she must rely on other medical evidence or authority in the record to support the RFC determination."  *Id.* (citing *Collins v. Astrue*, 324 Fed. Appx. 516, 521 (7th Cir. 2009)).

Here, the ALJ did not identify medical evidence from treating, examining or reviewing physicians that supported her decision to set aside these opinions and come

up with a different RFC. By finding that Deerwester was only mildly restricted in his activities of daily living, and in his concentration, persistence and pace, and moderately restricted in his social functioning, the ALJ relied solely on her own interpretation of the medical evidence and made conclusions that had no expert support in the record. *See, e.g., Hamilton v. Colvin,* 13 C 4036, 2015 WL 536127, at *7 (N.D. Ill. Feb. 9, 2015) ("The Seventh Circuit has cautioned ALJs against determining the paragraph B limitations in the absence of an expert opinion); *Gillin v. Colvin,* No. 11 C 7146, 2013 WL 1901630, at *5 (N.D. Ill. 2013) (remanding where the ALJ disregarded medical opinions in the record and reached a separate conclusion without any expert support). Without any expert foundation as to these criteria, the ALJ had a duty to solicit additional information. The ALJ's failure to do so here requires remand. *See Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010) (holding that in the absence of expert foundation for the B criteria, the court cannot discern a logical bridge from the evidence to the ALJ's conclusions); *Gillim*, 2013 WL 1901630, at *5 (holding that remand was necessary when the ALJ relied solely on her own interpretation of the medical evidence and made conclusions that had no expert support in the record).

The Commissioner argues that the ALJ obviously relied upon the opinion of state agency physician Dr. Boyd because the language in the ALJ's decision is similar to that in Dr. Boyd's report. However, the ALJ never cited to Dr. Boyd's opinion and it is not up to the Commissioner to fill in the holes in the ALJ's decision. *See, e.g., Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("The Commissioner insists that the record as a whole fills the gaps in the ALJ's analysis... But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law

require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."). In her opinion, the ALJ rejected the findings of other medical providers and then substituted her own judgment rather than relying on another medical expert. As a result, the necessary logical bridge from the evidence to the ALJ's determination is missing, and remand is necessary. *See Gillin*, 2013 WL 1901630, at *5.

**B.  The ALJ Did Not Error In Refusing To Give Significant Weight to the Opinions of Nurse Practitioner Julie Slind-Hull**

Although we have already determined that remand is necessary, we will briefly address the other issues raised in Deerwester's motion. He next argues that the ALJ should have given more weight to the medical source statement of nurse practitioner Slind-Hull from April of 2011. Slind-Hull opined that because of significant limitations in the amount of time claimant could continuously sit, stand or walk, as well as the number of breaks and days off he would require, he would be unable to work. Claimant argues that the ALJ improperly failed to give significant weight to these findings.

After our review of the ALJ's discussion of Slind-Hull's statements, we agree with the Commissioner that the ALJ appropriately considered Slind-Hull's opinion. First, although a nurse practitioner is not an "acceptable medical source," under 20 C.F.R. 404.1513(a), "[t]he opinion of a nurse can be used as evidence to show the severity of a claimant's impairments and how it affect the individual's ability to function," just as an "other medical source." *Id.;Turner v. Astrue,* 390 Fed. Appx. 581, 586 *(*7th Cir. 2010) (noting that a "nurse practitioner...is not a 'treating source'"). In deciding how much weight to give opinions from these other sources, an ALJ should consider "how long the

source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains an opinion; whether the source has a specialty or area of expertise related to the individual's impairments and any other facts that tend to support or refute the opinion." *Brown v. Colvin*, 14 C 23, 2015 WL 438723, at *6 (N.D. Ind. Feb. 3, 2015).

Here, we find that the ALJ appropriately considered these factors in deciding to give little weight to the opinion of Slind-Hull. First, the ALJ noted that Slind-Hull provided her opinion in the form of a "check mark" RFC assessment, with no explanation or narrative about the limitations outlined in the form. Moreover, the ALJ noted that the RFC was contradicted by other objective evidence in the record, including treatment notes from Slind-Hull, in which she indicated that Deerwester had normal gait, no swelling, the ability to move all extremities, normal muscle strength and tone, and no joint instability. (R. 687-91.) Finally, the ALJ noted that Slind-Hull made mental health assessments regarding claimant, yet she is not a mental health practitioner. For these reasons, we agree with the Commissioner that the ALJ appropriately considered and disregarded the medical source statement of Slind-Hull.

In contrast to the opinion of Slind-Hull, and as we touched on above, we find that the ALJ incorrectly disregarded the opinions of Heath (Deerwester's counselor) and Reeves (nurse practitioner who prescribed his medications). Applying the factors for weighing the opinions of "other medical sources," we find that the ALJ should have given greater weight to these opinions. Both of these providers regularly saw Deerwester (every two weeks) and their treatment notes reflect the familiarity they both

had with Deerwester and his medical impairments.  Moreover, mental health was the area of expertise for both of them.  The ALJ cited to the opinion of Dr. Carrello as a reason for disregarding Heath and Reeves' opinions but the ALJ then also disregarded part of Dr. Carrello's opinion.  Therefore, we find that the ALJ failed to adequately explain her reasoning for affording these opinions minimal weight.

## C. The ALJ Did Not Error In Finding that Claimant Lacked Severe Physical Limitations

Deerwester next argues that the ALJ erred at step 2 in finding that his physical limitations were not severe.  Deerwester also makes a related argument that the ALJ incorrectly found his testimony regarding his physical limitations was not credible.  The ALJ reached this determination because his alleged physical limitations were not supported by the evidence in the record.  We agree.

First, we note that our review of an ALJ's credibility findings is with deference and we may not disturb the weighing of credibility so long as the determinations are not "patently wrong."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).  To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p.  The ALJ should consider objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and "functional limitations."  *See* 20 C.F.R. § 404.1529(c)(2)-(4); *Simila*, 573 F.3d at 517.  If the ALJ gives specific reasons for her credibility determination, which are supported by the record, her determination will stand.  *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007).  But the ALJ may not disregard a claimant's testimony about the severity of her

symptoms without providing careful analysis. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353-55 (7th Cir. 2005).

Here, we find that the ALJ properly articulated her reasons for disregarding claimant's testimony regarding his physical impairments. As the ALJ stated, despite his testimony regarding debilitating pain, there are a number of references in the record to claimant regularly walking for exercise. In addition, throughout the record, there is very little evidence that he needs assistance with his personal needs, he is able to handle household chores independently and he cooks and grocery shops. Moveover, aside from the medical source statement of Slind-Hull, which we have already addressed, none of the treatment notes or other medical records supports a finding of severe physical limitations. Throughout his treatment records, it is noted that when he regularly takes his medication for blood pressure and blood sugar, his diabetes and hypertension are under control and his symptoms improve. In addition, there is no reference in the record to debilitating symptoms from these impairments. With respect to his alleged back and shoulder pain, the medical records showed mild cervical degenerative facet changes and mild cervical degenerative disc disease, but Deerwester regularly demonstrated good motor strength in all directions, normal muscle tone, no joint instability, negative straight leg raise and no other abnormalities. The ALJ outlined the medical evidence to support her decision that the physical limitations were not severe. Therefore, we find that she built the requisite "logical bridge" which enabled us to "trace the path of her reasoning" on this issue. For these reasons, we find that the ALJ did not error in finding that claimant's physical limitations are not severe and that his testimony regarding his limitations was not entirely credible.

## IV. CONCLUSION

For the reasons set forth above, Deerwester's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

**ENTER:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: March 12, 2014**